IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

WASTE CONNECTIONS OF MISSISSIPPI
DISPOSAL SERVICES, LLC                                                                                           PLAINTIFF

v.                                                                                    CAUSE NO. 4:22-CV-80-SA-DAS

FQS BEAR EQUIPMENT, INC.                                                                                       DEFENDANT

ORDER AND MEMORANDUM OPINION

On May 27, 2022, Waste Connections filed its Complaint [2] against FQS in the Circuit Court of Leflore County, Mississippi. FQS removed the case to this Court, premising federal jurisdiction on the basis of diversity. Now before the Court is FQS' Motion for Partial Summary Judgment [59]. Having reviewed the parties' filings, along with the applicable authorities, the Court is prepared to rule.

*Relevant Background*

For purposes of the present Motion [59], the pertinent facts of this case are relatively straightforward.

At all times relevant to this litigation, Waste Connections has operated the Leflore County Sanitary Landfill in Sidon, Mississippi. As part of its operations, Waste Connections owned a Caterpillar Model 836G trash compactor. Attached to the trash compactor was a fire suppression system.

FQS is in the business of inspecting various systems, such as fire suppression systems, to ensure that the systems are in good working order. Waste Connections hired FQS to regularly inspect the fire suppression system attached to the Caterpillar Model 836G trash compactor. On June 3, 2020, FQS conducted an inspection and thereafter prepared an inspection report which indicated that the system was operational.

About five months later, on November 2, 2020, Edward Thomas, a Waste Connections employee, was operating the trash compactor when smoke began rising from the rear of the compactor. Thomas pulled a pin on the fire suppression system to trigger its discharge function; however, the system did not respond and did not discharge any fire suppressant. Waste Connections employees attempted to use handheld fire extinguishers to suppress the fire, but they were unsuccessful. The trash compactor burned to the point that, according to Waste Connections, it cannot be used.

Waste Connections asserts a negligence claim against FQS, alleging that FQS' employee and/or agent breached its duty to inspect the fire suppression system as a reasonably prudent person would have done under the circumstances.

Through the present Motion [59], FQS seeks only partial summary judgment. More particularly, FQS seeks a ruling as to the correct measure of Waste Connections' damages. Whereas Waste Connections argues that replacement value is the appropriate damages measurement, FQS contends that the "before and after" rule governs. This narrow issue is the only one currently before the Court.

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex*, 477 U.S. at 323). "The nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalist arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

As indicated above, the precise issue before the Court is narrow in scope, as the parties' current dispute concerns only the appropriate measure of damages. Although the Court recognizes that the parties have not agreed upon the values that would apply under the different calculation methods, the Court, for the sake of providing context, notes that FQS' Memorandum [60] includes an explanation of the monetary figures at stake:

> Plaintiffs included with their initial Complaint, a quote stating the cost to replace the destroyed property as two hundred and fifty-two thousand dollars ($252,000.00), in addition to sales tax and delivery charges. The Plaintiff's designated appraisal expert placed an[] approximate fair market value of the compactor in the normal operating condition at one hundred seventy-five thousand dollars ($175,000.00) and a salvage value or retained value in its current condition at eight thousand dollars ($8,000.00). [The Plaintiff's designated expert] stated the replacement value was $345,000.00. Finally, Plaintiff's designated 30(b)(6) deponent stated that to his

3

> knowledge there were no "known" appraisal values placed on the compactor prior to the fire damage occurring. Waste Connections deemed the damage to be a total loss that could not be repaired.

[60] at p. 2-3.

Again, the Court notes these values only to provide context to the parties' dispute. It makes no findings as to the qualifications of any experts or the admissibility of any reports.

Since this is a diversity jurisdiction case, Mississippi law governs. *See*, *e.g.*, *Klocke v. Watson*, 936 F.3d 240, 244 (5th Cir. 2019) (citing *Hanna v. Plumer*, 380 U.S. 460, 465, 85 S. Ct. 1136, 14 L. Ed. 2d 8 (1965)) ("The *Erie* line of authorities holds that substantive state law must be applied in federal courts in diversity cases[.]").

"The general rule in Mississippi is that, if personal property is either destroyed or the cost to repair it is more than the pre-accident value of the property, the proper measure of damages equals the fair market value of the property prior to its destruction less the fair market value of the property immediately after the destruction (i.e. the salvage value)." *Wachob Leasing Co., Inc. v. Gulfport Aviation Partners, LLC*, 2016 WL 10536040, at *5 (S.D. Miss. Nov. 29, 2016) (citing *Coursey v. Broadhurst*, 888 F.2d 338, 344 (5th Cir. 1989); *Harper v. Hudson*, 418 So.2d 54, 57 (Miss. 1982)). "This is referred to as the 'before and after' rule of damages." *Id*. (citations omitted). Conversely, "[r]eplacement cost is *not* recoverable in a negligence action for destruction of personal property under Mississippi law." *Id*. (citing *Ballard Realty Co. Inc. v. Ohazurike*, 97 So.3d 52, 63 (Miss. 2012); *Harper*, 418 So.2d at 57; *Miss. Power Co. v. Harrison*, 152 So.2d 893, 903 (Miss. 1963)) (emphasis added).

Despite this general rule, there is an exception to the "before and after" rule when the action concerns unique property: "Mississippi case law likewise suggests that an alternative to the 'before

4

and after' rule is appropriate only with respect to unique property that has virtually no market value." *Id.* (citing *Miss. Power Co.*, 152 So.2d at 903) (additional citations omitted).

FQS urges this Court to apply the "before and after" rule and limit Waste Connections' potential damages to the fair market value of the trash compactor prior to its destruction less the salvage value. Arguing in opposition to the application of the general rule, Waste Connections makes two arguments. First, it contends that "the compactor was unique and had unique value." [63] at p. 1. Second, it argues that "replacement value—not fair market value—will restore [it] to its prior position." *Id*. The Court will address these contentions in turn.

As to its uniqueness argument, Waste Connections argues that the compactor "had unique value because, despite having an older model year, it had a rebuilt engine and had an AFEX fire suppression system, making it particularly difficult to replicate." [63] at p. 2. To support this contention, Waste Connections relies on the affidavit of Troy Thompson, the entity's district manager, who testified via affidavit that "[t]he compactor at issue in this case was unique—among other things, it had a rebuilt engine and it was outfitted with an AFEX fire suppression system." [63], Ex. 1 at p. 1.

Waste Connections cites two cases to support its position—the Fifth Circuit's decision in *E.I. DuPont de Nemours & Co., Inc. v. Robin Hood Shifting & Fleeting Serv., Inc.*, 899 F.2d 377 (5th Cir. 1990) and this Court's decision in *Schilling Enterprises, LLC v. Superior Boat Works, Inc.*, 2006 WL 2577848 (N.D. Miss. Aug. 31, 2006).

*DuPont* involved the damage calculation for a barge, owned by DuPont, that was used to carry sulfuric acid to a refinery located on the Mississippi River. *DuPont*, 899 F.2d at 379. One day, the barge (named EIDC-3) was being towed by a tugboat (named M/V RANDY JETT). *Id*. On the trip, the RANDY JETT lost power in one of its engines, causing it to lose control of the

EIDC-3, which in turn caused the EIDC-3 to hit the anchor chain of an anchored bulk carrier and sink the following day. *Id*. DuPont filed suit against Robin Hood, which was under a long-term towing contract with DuPont and chartered the RANDY JETT, and against TTI, the owner and operator of the RANDY JETT. *Id*. Prior to trial, all issues were resolved other than the amount of damages owed for the sunken barge. *Id*. After hearing testimony from experts, the court, proceeding via a bench trial, "awarded DuPont $250,000 for the value of the barge, but denied any increased award for uniqueness and special value of the barge to DuPont." *Id*.[1] In reaching that damage amount, the district court relied on the replacement cost of the EIDC-3. *Id*.

On appeal, the Fifth Circuit specifically addressed DuPont's contention that the amount should be increased because of its special value:

> DuPont first argues that the award of damages should be increased to compensate it for the special value that the EIDC–3 had to DuPont. Prior to the accident, DuPont used five barges, including the EIDC–3, to service the Chevron refinery in Pascagoula, Mississippi. These barges would deliver virgin acid to the refinery and pick up spent acid, which would be transported back to DuPont plants for reprocessing into virgin acid. DuPont points out that the EIDC–3 was uniquely suited for this task.
>
> The EIDC–3 was a 2,000 ton dual-capacity barge. Its centerline tanks were designed to carry 2,000 tons of virgin sulfuric acid to the refinery, while its wing tanks carried 2,000 tons of spent sulfuric acid from the refinery. This dual capacity enabled the EIDC–3 to carry up to 2,000 tons of acid each way, thereby avoiding the costly and environmentally hazardous need to clean the tanks before loading them with virgin acid. The problem with valuing the EIDC–3 is that there are no barges comparable to it, and thus no market value for dual-capacity, 2,000 ton barges.
>
> The closest equivalents are 1,400 ton and 2,000 ton single-capacity barges. But even if these barges were retrofitted with dual tanks, they still would only have a one-way capacity of 700 to 1,000 tons. At trial, DuPont introduced evidence that in order for DuPont to fulfill its contract with Chevron, it would take two 1,400 ton barges

---

[1] The district court also awarded other damages, such as for loss of use and prejudgment interest, not pertinent to the case *sub judice*.

> 86 round trips at a yearly towing cost of $946,000. Two barges like the EIDC–3 would require only 30 round trips at a yearly towing cost of $330,000. This is strong evidence that the EIDC–3 was much more economical than other barges, and that there is no comparable market for the EIDC–3.
>
> But the district court was entirely correct in holding that DuPont was not entitled to any value greater than what it would cost to replace the EIDC–3. When no market value exists for a vessel, "other evidence such as *replacement cost,* depreciation, expert opinion and the amount of insurance can also be considered." *King Fisher,* 724 F.2d at 1185 (emphasis added). By using replacement cost, the district court took into account whatever special value the EIDC–3 had to DuPont.

*Id*. at 380.

As this quoted language makes clear, the Fifth Circuit affirmed the district court's utilization of replacement cost as the appropriate measure of damages but simply concluded that DuPont was not entitled to any greater amount.

Waste Connections also relies on this Court's decision in *Schilling*—another admiralty case. *Schilling*, 2006 WL 2577848. There, the defendant, Superior, operated a shipyard on Lake Ferguson in Greenville, Mississippi. *Id*. at *1. Superior also owned a tugboat M/V CAPT. STOVALL, as well as a sunken barge named the B6, which sank in Lake Ferguson several years prior to the pertinent facts. *Id*. The plaintiff, Schilling, owned the SPLASH casino barge. *Id*. Schilling contracted with Superior to provide moorage space for the SPLASH barge while the SPLASH barge was being repaired and refurbished so that it could return to service as a casino. *Id*. When trying to reposition the SPLASH barge using the CAPT. STOVALL, the SPLASH barge contacted the sunken B6 and eventually capsized. *Id*. Schilling filed suit against Superior, seeking damages incurred by the loss of the SPLASH barge. *Id*.

7

This Court held a bench trial and ultimately awarded damages to Schilling. *Id*. In assessing the damages warranted for the loss of the SPLASH barge, the Court discussed the pertinent evidence and concluded:

> In the case *sub judice,* it is undisputed that the SPLASH casino barge is a constructive total loss. The Plaintiff, utilizing the replacement cost approach to valuation, presented evidence at trial that the SPLASH had a fair market value at the time of sinking of $3,032,000. The Defendant likewise presented expert testimony at trial; its expert, utilizing the comparative sale approach, calculated the fair market value of the SPLASH casino barge at $500,000.
>
> The court finds that the SPLASH casino barge is a constructive total loss, as it is undisputed that the cost of salvaging and repairing the vessel exceeds the fair market value it possessed immediately prior to its allision with the B6 barge. Because the Plaintiff's damage appraisal expert, Norman Dufour, admitted during cross-examination that his appraisal underestimated the age of the SPLASH's hull, however, the court finds that his estimate of $3,032,000 is inflated. He testified that the SPLASH's hull had an estimated 30 year total life and that it had 10 years of that 30 remaining. The SPLASH's hull, however, was already 35 years old at the time of the subject allision. Dufour also underestimated the age of the SPLASH's superstructure in his $3,032,000 estimate by eleven years; he assumed it had been built in 1992, when in fact it was built in 1981 and then remodeled in 1992. Upon being presented with these facts, Dufour testified during trial that his opinion as to the SPLASH's value would be materially affected by these facts. He did not, however, provide a new estimate of the SPLASH's market value.
>
> Likewise, the court finds that the Defendant's preferred approach of simply utilizing the comparative sales approach is flawed because the SPLASH casino barge *obviously had unique qualities to its owner because it was a casino barge and had undergone extensive renovation for that purpose; thus, other methods of valuation, such as replacement cost, may be used as well. King Fisher Marine,* 724 F.2d at 1185-86. The Defendant's expert, William Carrier, discussed five comparable sales of casino vessels, which ranged from zero dollars for a barge that was given away after no purchasers sought it, to a $600,000 sales price for a barge similar to the SPLASH.
>
> The court finds that the SPLASH casino barge was a special purpose vessel that consisted of two barges that the Plaintiff Schilling

>purchased from Ashland Oil in 1980 when the barges were around 10 years old. In 1981, Schilling modified the barges into a restaurant and night club. Thereafter, in 1992, Schilling remodeled the barge that would become the SPLASH casino barge at a cost of $800,000. The remodeled SPLASH casino barge weighed nearly 3,000 short tons and was 250 feet in length and 50 feet wide, providing over 17,000 square feet of operating space for commercial casino use. The SPLASH then operated as a casino in Tunica, Mississippi, from 1992 until 1995, when it was moved to Vicksburg, Mississippi. After remaining in Vicksburg for a year and a half, the SPLASH was moved to Port Allen, Louisiana, where it remained moored and out of service until it was towed to Lake Ferguson in June of 2004. It was the first casino barge licensed by the Mississippi gaming commission and was moved to Lake Ferguson in order to be retrofitted and moved to a new location to recommence service as a casino.
>
>Taking into account all of the above-denoted factors, the court finds that the fair market value of the SPLASH casino barge prior to its capsizing was $900,000. While utilizing the comparative sales approach leads to a valuation of $600,000 at most, the court finds that replacement cost should also be considered in valuing the SPLASH barge. While the Plaintiff's estimate of $3,032,000 is undisputedly too high, the court finds that a value of $900,000, fifty percent more than the Defendant's estimate, properly takes into account the cost of the barge, the cost of modification and remodeling, and the SPLASH's unique qualities.

*Id*. at *5-6 (emphasis added).

Relying on *DuPont* and *Schilling*, Waste Connections contends that replacement cost should be considered in determining the appropriate measure of its damages in this case. However, the Court notes one major difference between *DuPont* and *Schilling* and this case—Waste Connections has not come forward with sufficient summary judgment type evidence to illustrate that the trash compactor is of the same unique nature as the barges at issue in those cases. In fact, the only summary judgment type evidence that Waste Connections has submitted is Thompson's affidavit, wherein he states that "[t]he compactor at issue in this case was unique—among other things, it had a rebuilt engine and it was outfitted with an AFEX fire suppression system." [63],

9

Ex. 1 at p. 1. This affidavit is, in this Court's view, conclusory. Thompson states that the compactor had a rebuilt engine and a fire suppression system, but he does not explain how those two attributes make the compactor unique. For instance, he provides no explanation as to whether other trash compactors utilized in the landfill marketplace contain those attributes—he does not even state whether other trash compactors that Waste Connections itself owns contain those attributes. This is vastly different than the evidence at issue in *DuPont* and *Schilling*—two cases where the property at issue was undeniably unique.

Thompson's use of the word "unique" does not in and of itself make the trash compactor unique or create a question of fact. *See*, *e.g.*, *Lester v. Wells Fargo Bank, N.A.*, 805 F. App'x 288, 291 (5th Cir. 2020) ("Of course, when an affidavit is conclusory, it cannot preclude summary judgment—whether it is self-serving or not."); *DIRECTV, Inc. v. Budden*, 420 F.3d 521, 531 (5th Cir. 2005) ("Plaintiff's attempt to create a fact issue as to his knowledge by relying on a conclusory and self-serving affidavit is on unsteady ground.").

The Court also notes that despite stating in his affidavit that the compactor was unique, Thompson testified in his deposition that Waste Connections simply moved a compactor from another location to fill its need at the Leflore County Sanitary Landfill:

> Q. Does -- to make sure I'm understanding, Waste Connections did not purchase a replacement compactor for the one that burned; it simply used one that was already owned by Waste Connections?
>
> A. I -- that's -- that would be above my pay grade. I don't know.
>
> Q. Okay.
>
> A. *All I know is that we needed a compactor and they sent a compactor from another state, Louisiana, over here for us to use.*
>
> Q. Okay.

10

> A. So you know, I don't know if they have purchased another compactor or not.
>
> Q. *Okay. Gotcha. But if they have -- "they" the company -- it's not being used at the [Leflore County] facility?*
>
> A. *Correct.*

[65], Ex. 1 at p. 3-4 (emphasis added).

Although not necessarily dispositive, Thompson's deposition testimony cuts against the argument that the subject compactor was unique.[2]

Stated simply, considering the evidence before it, the Court finds *DuPont* and *Schilling* to be easily distinguishable from the case at bar. Rather, the Court finds that this case more closely resembles the underlying facts of *Wachob*, 2016 WL 10536040.[3] There, a Cessna jet aircraft owned by Wachob Leasing was damaged while parked on a tarmac. *Id*. at *1. Wachob had left the aircraft for storage with a company named Million Air. *Id*. A helicopter operated by the Mississippi Army Reserve National Guard ("the Government") landed at the airport and, while being maneuvered to park by Million Air, struck a light pole located near Wachob's aircraft. *Id*. Debris from the helicopter's impact with the light pole damaged Wachob's aircraft. *Id*. Wachob asserted bailment and negligence claims against Million Air and a negligence claim against the Government. *Id*.

The Government filed a motion for partial summary judgment, seeking a ruling that Wachob's damages were limited to the "before and after" rule. *Id*. at *2. Wachob opposed the

---

[2] The Court also notes that, while Thompson's deposition occurred on October 6, 2022, his affidavit was only recently executed on November 10, 2023—at which time Waste Connections was preparing its Response [63] to the present Motion [59]. Although the Court certainly does not rely on that fact alone in reaching its conclusion, it is noteworthy.

[3] Waste Connections includes in its Memorandum [63] a conclusory statement that "*Wachob* improperly limited the valuation standard, failing to consider cases like *DuPont* and *Schilling*." [63] at p. 2. However, other than that statement, Waste Connections provides nothing to support its argument. As the Court has already found *DuPont* and *Schilling* distinguishable, the Court finds Waste Connections' contention on this point to be meritless.

11

request, arguing that it "could only be returned to its pre-accident position by purchasing a new aircraft with the same attributes as the damaged 2007 model aircraft." *Id*. Wachob also submitted an affidavit of its president, Derek Wachob, who identified certain unique attributes of the aircraft:

> Wachob had Cessna build the aircraft with a special ten-seat configuration when it is normally manufactured in only 8-seat and 9-seat configurations. The Aircraft built in the special ten-seat configuration required specialized engineering and regulatory approval. The Aircraft as built by Cessna for Wachob was uniquely suited for Wachob's needs and business requirements.

*Id*. at *2.

Derek Wachob also testified in his affidavit that the ten-seat configuration of the aircraft was essential for the entity's business operations. *Id*. at *3.

The District Court for the Southern District of Mississippi limited Wachob's damages to the "before and after" rule. *Id*. at *8. The court was "not persuaded that Mississippi law provides for full replacement cost as a measure of damages with respect to property that has an ascertainable fair market value." *Id*. Similarly, the court noted that "Mississippi case law likewise suggests that an alternative to the 'before and after' rule is appropriate only with respect to unique property that has virtually *no* market value." *Id*. at *9 (citing *Mississippi Power Co.*, 152 So.2d at 903; *Austin v. Millspaugh & Co.*, 43 So. 305, 306 (Miss. 1907); *Louisville & N. R. Co. v. Stewart*, 29 So. 394, 394 (Miss. 1901); *Hodges v. Causey*, 26 So. 945, 946 (Miss. 1900)) (emphasis in original). Ultimately, the court rejected Wachob's attempts to apply different damage evaluations, such as one set forth in the Restatement (Second) of Torts, and, as noted above, concluded that the "before and after" rule governed. *Id*.

The Court finds persuasive the reasoning articulated in *Wachob*. In fact, the aircraft at issue in *Wachob* appears to be of more of a unique character than the trash compactor at issue here, at least based upon the summary judgment type evidence that has been submitted for consideration.

12

Nonetheless, the district court in *Wachob* found that the aircraft was not unique for purposes of the damages calculation.

Ultimately, the "before and after" rule applies here. Although the Court recognizes the existence of the uniqueness exception, Waste Connections has failed to come forward with sufficient evidence to illustrate that the exception should be applied here.

Waste Connections' second argument is that only replacement value—not fair market value—will restore it to its pre-incident condition. In other words, Waste Connections contends that the "before and after" rule will not make it whole. Waste Connections cites two cases to support its contention: *Harvey v. Guangdong Kisense Co.*, 2020 WL 5632962 (N.D. Miss. Sept. 21, 2020) and *Jones v. Malaco Music*, 2 F. Supp. 2d 880 (S.D. Miss. 1998).

*Harvey* was a personal injury case involving a plaintiff who was injured when a pressure cooker exploded. *Harvey*, 2020 WL 5632962 at *1. *Jones* involved an alleged breach of a publishing agreement, pursuant to which the defendant was given the "sole, exclusive and unrestricted worldwide right" to "administer and exploit the [plaintiff's] compositions throughout the world" in exchange for a pre-determined sum in royalties. *Jones*, 2 F. Supp. 2d at 882.

These cases are easily distinguishable, as they involve completely different underlying facts and causes of action. The Court declines to apply them, particularly considering that Mississippi law sets forth a specific rule for calculating damages of personal property—the precise nature of damages involved in this case. Neither *Harvey* nor *Jones* have any bearing on the damage calculation in this case. The "before and after" rule applies.

*Conclusion*

For the reasons set forth above, FQS' Motion for Partial Summary Judgment [59] is GRANTED. Waste Connections' damages shall be limited to the "before and after" rule at trial.

SO ORDERED, this the 16th day of January, 2024.

/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE